Council. Good morning, Your Honors. John Vishnesky on behalf of MHM Services, Inc. May it please the Court. Good morning. This is an excess insurance policy timely notice case, and that's a critical point in this case. We have from the Supreme Court a reiteration recently of the five factors that are to be considered. But each case has to be considered on its own facts and circumstances. In this case, it turns out, I think, that the critical factor is the first factor. The first factor is whether the policy, the type of policy and the language used in the notice provision, makes a difference. And here, because it's an excess policy, this is a policy where a reasonable insured looks at it and says, well, do I have a case that comes, it's going to reach that level. When did they look at it, though? Isn't that the issue? The issue for diligence is when did they look at it, and when they looked at it, what did they do? The issue for when they knew they had a suit that came within coverage is when should they look at it? And that's why the first factor's important. In Yorkville, they kind of knew all along, and the insurance company was sort of notified multiple times all along, and the insurance company was kind of dissuading the suggestion of coverage, was it not? I think Yorkville is unhelpful on this first point. Right. And Yorkville basically says that since there's no time limit, then the reasonableness has no meaning? I'm not sure. No, Yorkville says that there's so... It's a neutral factor under this language. I'm sorry? It says it's a neutral factor under the language. The language of the Yorkville, the policy is the same as the language here, isn't it? Right. And because it's a primary policy in Yorkville, I want to pull you over to a case, the Zurich versus Walsh case. Zurich's the parent company of insurance. They've been through this before. The identical language in a excess policy is treated differently. And Zurich made exactly this argument, in Zurich versus Walsh. Zurich argued that its policy should not be treated like other true excess policies, which give the insurance discretion in providing notice. Zurich, Assurance, made exactly this argument in a 2004 case in this district authored by Judges Tice that is the latest word on this. And it really, it brings this case into the line of cases where insurers have some discretion to determine whether the case is going to reach the level of the excess policy. Well, you pretty much argue that they essentially have the discretion, whatever their discretion is, they pretty much have it and there is no input or any other thing for the court to look at. They exercise the discretion, basically unlimited discretion, as to when to notify. Absolutely not. All right. And the Zurich case teaches on that point, too. The discretion is what would a reasonably prudent person do. It's an objective standard. It's not actually even what they did. It's whether knowing the facts and circumstances that this insurer knew, what was reasonable. All right. Well, and you rely on the subjective determination by your client that so many of these cases on which they are a defendant were frivolous, which pretty much ignores the fact that this was a case where a woman was raped after being attacked while running through a forest preserve and had her throat slashed and was, I think, covered up with leaves and left to die in the forest preserve as somehow being related to prisoner suits, including, as the appellee points out in the brief, many of which have to do with failure to properly treat or diagnose medical issues in the penitentiary. There's certainly a qualitative difference between these types of lawsuits and it strikes me as a little bit like an ostrich putting its head in the sand to think that they're comparable or that it makes a difference what happens in other lawsuits when you have a complaint. And I think Judge Mason even referred to this in her ruling. To put those two in the same category seems like an Alice in Wonderland approach. Your Honor, that is one small factor of many. I think the critical thing to focus on here is, first of all, the case that's right on point. But it has to be a reasonable belief. Absolutely. So answer, if you could, answer how, to Justice Epstein's question, it would be reasonable to compare this in any way, shape, or form with other lawsuits that had been presented to your client. The only effect that factor has is that this is the first time that MHM was faced with a suit that went beyond a $10,000, $25,000 case. Now, what did they do? Did they just blindly put down a small reserve? Well, they notified their primary. They absolutely did, and they met monthly with their primary carrier, with their outside counsel, and they considered what their reserve should be monthly. On September 30th, the end of their fiscal year, they had a deep dive on their cases. And they had important defenses in this case. Yes, important defenses, and the possibility of a very, very large verdict and excess carrier that would probably be very interested in being involved in the defense of this case. This is where the Check Your Taxi case comes in, Atlanta International versus Check Your Taxi. That was a case where a taxi crossed the median and went head-on into a 36-year-old woman with two children and killed her, and there was a primary policy that was only $400,000. And Atlanta, the insurer, made the exact same argument, said, this is a terrible thing. There's no way that this could be anything but an excess case. But that's not what the court held. The court said, wait a second, there's evidence from the investigation that that taxi was hit from behind and launched across the median. And they looked at other factors, factors that are important here. The ad damnum in that case was in excess of the jurisdictional amount, $15,000, I think, in that case here, it's in excess of $50,000, no large ad damnum. There was no large. But you'd strike any ad damnum over $50,000 as improper surplusage. That's the jurisdictional amount that has to be pled to have it in a law division. That's right. So, I mean, it's nonsense. If you had a $20 million case, you should say in excess of $50,000 and not say $20 million. Well, the court looked at that in the check. Well, let's look at the factors, because we're bound by that. We're bound by considering the factors. And is your argument essentially that the only factor that weighs in favor of your client is that it's sophisticated in the areas of commerce and that every other factor is the opposite or weighs against? That's exactly right. Every other factor weighs in favor of coverage. What was that? Now, does it matter that the MSM was getting maybe some conflicting advice from people within its own organization or an attorney? MSM was not getting conflicting advice. Or maybe not good advice. They weren't good advice, as far as they could tell. I mean, they met monthly. Is it reasonable to not check out all your policies from the get-go when you get something like this thrown in your lap, this kind of a lawsuit? It may be prudent, but it's not required. Reasonable is the standard, not prudent. It's what is reasonable. There are reasons not to do it. What are they? The excess insurers don't want to know about every case. And they do care whether you have a slam-bang defense to something, even if somebody's making a large... So, on the first factor, what are you going to say? It's just neutral... No, the first factor is in our favor because this is an excess policy. Okay, so... And it provides that factor that people need to look at whether the case is going to... You never get to look at a policy unless you think this is going to be in excess of your primary. We had a $250,000 salvage of your attention. There were some signs that $1.5 million was being offered, or $1 million. Weren't there those signs before notification? No. No? At no point was there an offer until June 15th of 2008. Okay, well, here, let me ask you this. Did the case settle before assurance was notified? No. How soon before assurance was notified? Or, how soon after did the case settle? It settled on September 19th. That's when the settlement papers were signed. Okay, and when... But there was an agreement in advance of that. There was an agreement in advance. About five weeks in advance. No, it was August 15th. Okay, so how many weeks? Four and a half weeks. Four. All right, whatever. Okay. Was that a time to notify? They were notified on July 9th. Okay, and what's important about that, there's no argument for prejudice by assurance. No argument. No argument. Assurance was notified because they were begged. Why? Because they should be... They were begged to help and get involved. No prejudice because they were being taken care of? Their position was the same as the other policy, the other insurance company? No, their position was no coverage. Goodbye.  They didn't want to participate. The letter from Dena Johnson on August 7th, her third letter to them asking for help, says... In fact, isn't it Ms. Johnson who really kind of comes in, takes over, and says, you know, makes the notification? Isn't she the one that says, we need the other, we need that excess policy? She basically overrules everybody else. Okay. She's also the first one to really look at the policy, isn't she? No, no, no, no, no. Let me just get the sequence out. There's no indication that this case is going to be a big case when consulting with outside counsel and the primary insurer who is actually responsible for setting their own reserves, because they've got the million over the $250,000. Are all these mistakes of the others really significant in terms of whether MHM acted reasonably? MHM consulted people that it should be able to rely on. It's counsel, it's primary insurer who's defending the case. Are there mistakes, something that should really be a part of this equation? They're part of the equation as to when there was a realization by the executives at MHM. Remember, there's a notice clause, special notice clause in this policy that says notification of a suit or a claim doesn't count for having to notify the insurance company until the executives know something. Okay, so the fact that, you know, some attorney out here doesn't communicate something, says something, that doesn't really have any effect. What's important, the executives are looking at this on a monthly basis. They're asking their counsel what's going to happen. But they're not looking at their excess policy. Excuse me? They're not looking at their excess policy at any time until Johnson arrives. They're looking at the case. Yeah. The case doesn't go. So you agree they don't look at the policy to determine if there's any. Here's what happens. Finally, in April, April 24, we lose summary judgment on March 11, 2008. Our primary carrier ups its reserve 500,000, that's all. The first evaluation letter of the case comes April 24, 2008. Simultaneously, almost, I think a few weeks before, a request for excess coverage comes from the plaintiff. Everybody looks at it at that point. The executives look at it. One point is that the trial court says that this could be a 10-figure verdict. On March 11, 2000, no, the trial court never actually gets to 10 figures. What did it say? It says 5 to 7 million. 5 to 7, who said 10? That was the counsel, wasn't it? Eric Singer, the counsel. It's April 24th letter. As far as we know, the first time the executives of MHM even know what was said by the trial judge on March 11th, is that April 24th letter. Was there, what about the internal documents of the doctors and comments that were made about the potential for a problem because one of the doctors sort of blew this whole thing off? That, again, comes in the April 24th, 2008 letter from Eric Singer. This is the first time the MHM people looking at this get that information. And they, indeed, up their reserves. Why is this the first time they're looking at that? Well, those interviews and stuff didn't take place. Any particular reason why they weren't looking at these things? Because they had already tendered this to their primary hearing. You're saying they're all coming out at the end. It's not the end. The defense counsel is focused on these two major defenses. The immunity under the statute because RAC is an agent of the statute. It says agents are immune. And the fact that there is a case, the peaceful court's case, that says if a sex offender. That was the case where the statute had been amended and I believe it was the counsel for the primary insurance company said that it was apparent that that case didn't apply. Weren't there internal memorandums regarding that? Defense counsel said we think this is a good motion based on diesel horse. Mr. Calagiro. The court didn't agree, though. Mr. Calagiro, who was the outside counsel, said the same thing and the court. You don't want to answer the question? Didn't agree. Okay. There are lots of people they're talking to and asking about these things and they're focused on those major defenses. But you're focused on a major defense. Does anyone ask the question and what if it doesn't work? We're looking at, as any reasonable person would, a large verdict if it doesn't work. Do you work without a net? They do ask that question. And Mr. Santoli, who is a senior person at the primary insurer, who has a lot of experience in rape cases, says I've never seen one that's gone over a million and sets a reserve for $500,000 the day after summary judgment is denied. Is there any information about what kind of rape cases he was dealing with? I mean, I'm not aware of any case sort of with a factual scenario like this. I think all rape cases are pretty bad. No, this involves the negligent failure to have someone examined for purposes of the sexually violent persons act, commitment, civil commitment. So I'm not sure what they were referring to. Other rape cases in prison involve rapes within prison where you have mental health professionals who are supposed to be, you know, treating people and maybe recognizing these things and being charged with negligence. And they're equally horrific cases. Wasn't there a comment in there, though, that after reviewing it that this victim AB had suffered no long-term adverse consequences so it wasn't that bad? I mean, here's somebody who was abducted while exercising, having sexually assaulted and having her throat cut, and somebody actually gave an opinion which apparently was credited that this was no big deal in terms of potential damages. It was hardly all the opinion. He was also saying he's seen a lot of rape cases that are terrible and none has ever gone beyond a million. Their reserve wasn't set. I don't know what they were talking about, though, because this case was a little bit different. It involved a person who had been convicted of sexual assault, went out, committed another sexual assault, went out. Parole was violated for battery or an aggravated battery, which, you know, might have been another sexual assault case that didn't get charged as such. And he was released for the third time and then rapes another, or sexually assaults, I should say, another woman, slashes her throat, leaves her for dead, and then the thrust of this case is that the person who should have at least initiated whether he should have been looked at for purposes of filing a civil commitment paper dropped the ball. So I don't know what those other, when they said those other rape cases. I mean, this is not something that we've seen reported where there's a complaint about the negligent failure to suggest that he at least be given a look. The issue in the case, and just to make sure you get the chronology right, is that Christopher Hansen, the rapist, had a sex offense and was serving his sentence and then was out on parole, committed a battery, went back and for violation of that parole, and there was one that was ancient history. Well, actually, I don't think the time frame was that long between the time of release and the time of the next charge. No, no, he had fully, fully completed his sentence. Of course he did. That's how he got out. A mandatory supervised release is what you're talking about. Right. He fully completed his sentence for the sexual offense. He was the second one.  Then he committed the battery, and at the time he was up for review, he was only in for the battery. The change, the subtle change in the statute was that it could apply to concurrent offenses. It's not clear whether, you know, when you're serving concurrent sentences, if one's been completed and the other hasn't. You know, our counsel thought that that was a very weak point. If someone looking at this, you know, a reasonable person would think there's a potential for a large verdict when somebody dropped the ball so that he was able to commit a third sexual assault. So that's really, is it reasonable to say, you know, this is really a little something we don't have to worry about, or is this one of those cases that screams out for a large verdict, a potential very large verdict based upon the facts? And I guess, as physicians know. Physicians know because you have to look at the overall picture. That's what the check for taxi cab says. I mean, this is horrific, but it's nothing more horrific than a cab smashing into a 36-year-old mother with two kids and killing her. Well, I don't know that we should be comparing them, but. I mean, they're both terrible, terrible things, but the principle set in the check for cab case, check for taxi case, is that you do look at what the defenses are. You do look at what the considered reasonable evaluation with the vice principal. And what was the major defense here? The major defense here was that we were acting as an agent of the state. Yes. When you look at the statute, it says there's a need of agents of the state, right? How the trial judge got around that, nobody can still figure. The second thing was that there must be a current sex offense at the time when the review comes up. And even in the Diesel case was right on the point on that and would have knocked it out. The subtle change in the statute. There was a real problem with that defense that could have been made immediately appealable. They did try to appeal it. And it was denied. It was denied. There was a request for an allocatory appeal, and it was denied. The trial court denied the request. Correct. For 304A language. It was not 304A, it was for 308, because it wouldn't have been final. It was a denial of summary judgment. So there was an attempt to do that. Was there also an issue in this case that there was an initial evaluation at the time that the suit was filed, that there was a belief within your client's company, based upon professional evaluation, that given the nature of the coverage, that this wouldn't even fall within the coverage? There's a contested fact on that point. The California lawyer says that was my opinion, and I reported it to people. And other people said he never reported it to me. Actually, all the record says is that Lee Calagaro testified that he called the controller, and either Susan Ritchie, who's an executive, the controller's not, either Susan Ritchie or Mike Pinkert, both of whom are executives, he wasn't sure. And said, is there excess coverage for this claim? And the answer was no, according to his testimony. But all those people said that conversation never happened. So if that's a critical fact, well, I mean, where's the diligence in looking at the existing policies that you have coverage on, and reading the policies, and making a report to those policy-issuing companies, because you have something that is a potential large verdict, and that's why you buy excess coverage. If you believe Lee Calagaro, then there must have been a review by these executives of the policy. Understand, this policy had an exclusion on it. When you get, this was a renewed year-after-year policy, and in the 2004, 2005 year, apparently the exclusion wasn't put on. But at renewals, it was placed on the policy, and there was a note tucked in saying, we didn't put it on for 2004, 2005. And so people didn't notice that note. What they saw was there was this exclusion, and everybody was trying to evaluate this exclusion, and everybody who looked at it said there's no coverage under this exclusion. Okay, and Med said that Eric Sinner didn't produce the policy setting up the client for sanctions, because he thought it didn't cover it. Do you have any questions against these other individuals? I'm sorry? Well, when Camp Med is giving them bad advice, or when their own people are saying that, you know, we don't think there's coverage under any other policy, or we don't even know there's another policy. I'm looking at MHM, and bringing in all these people and saying, well, this shows that they were acting reasonably, because they were basically getting bad advice from everybody. Ultimately bad advice. Yes, ultimately bad advice. But it was, I mean, you should be entirely relying on advice from experts. If they were giving bad advice, and maybe they have their own potential liability, but does that make it all reasonable? Well, because they're the sort of people you would ask about this. I mean, MHM executives run a business that gives health care. But isn't this sort of like, isn't there a concern here that it was almost as if, well, we do have a policy, but, you know, we're just not going to, we're not going to look at it at all. We're not even going to take any steps. Until you've got a case that you think is going to get to that level, there's no reason to do a careful analysis of the policy. All right, so that, I understand. So when they get that, when they get there in April of 2008, they do look at it. But this case, they were kind of just lumping this in with everything else. So it was really just a kind of variety. No, they weren't just lumping it in. They were very, they were giving strong, what they were focused on was the value of the case, because they had to do reserves every month. It was important to them because they had lots of these cases. And they did have a deliberative process every month with counsel, with their primary insurer, because it was their money. But isn't, isn't there an economic reason when you have to put in these reserves? Maybe not overt, but isn't there a financial advantage potentially to say, we have an evaluation that the value, potential value of this case is lower, and so they have to put less in reserves. Doesn't that help them? I suppose if somebody wanted to be dishonest, they could, but. Not dishonest, there's two views of everything. When you walk in and try to settle any case, one side says something, and the other side says another. They each have a reason for doing that. It's not dishonest. And in this case, there's an economic incentive for insurance companies or people who have reserves that they have to put up to evaluate the case with a little different eye than the people who are seeking the damages. Because they have to put less in reserves, and that puts them in a better financial situation. Isn't that the way that works? I don't think so. I think the economic incentives are exactly opposite. For one, you have Camp Med, who's part of this process. It's got a million dollars on the line. They have to go through a process through several layers in order to set their reserves and make sure the money's there for defense if they need to defend and to pay. Because if the case comes along and they don't have the reserves, they're in trouble. The same thing applies for MHM. They have cash flow issues. They have to know what money is tied up and what money's not tied up. And they certainly have an economic incentive to have their excess carrier on notice and waiting to write a check. So, I mean, there's no economic incentive to not notify. They have an economic incentive not to tie up money that they think they might not have to tie up, even if they end up underestimating the ultimate value of the case in the long run. Now, where that runs into a problem is when someone's asleep at the switch and doesn't notify the excess carrier because then you've just cut the ropes for your safety net. But it's all the same people looking at this. They're looking at the reserves. They're looking at the value of the case. And when they see the value, when they set their reserve, after the April 2008 letter, they set their reserve for $100,000 for settlement, which means they thought it could go above a million, they'd have to put $100,000 in themselves beyond their defense costs, which they had essentially eaten up most of the self-insured retention. At that point, everybody's looking hard at this, and it's a confusing policy. And we know that because when we do give notice to Assurance, Assurance looks at it and says the same thing, there's no coverage. And critically, Craig Carver, who was the adjuster, looks at this as there's no coverage and Deposition asks, well, would you say the same thing whether you got notice two years ago or now, and he said, yeah, I would. Moving on to some other issues that you've raised, you indicate that should we reverse the trial court's grant summary judgment on late notice, then we should reach the issue of whether there was bad faith under the Virginia statute. Am I understanding your statement correctly in the brief? Close. Well, what do you mean? The Virginia statute is a waiver statute. Yeah. But what do you mean by should we? So let's assume that we affirm, then we don't get to that. Is that what you're, I'm not, is that what you're saying? Yeah, I think so. And why is that? Unless, you know, in a situation where we've violated, you find as a matter of law that we've violated the notice provision, there's still a possibility that they've acted so badly that we get bad faith damages, I suppose that is possible. Okay. It's not an argument I usually put a lot of weight in, but our view is that once you get past that and you look at what this insurance company did, it's reprehensible. Okay. So, but that's only if we decide that the, on our de novo review, that summary judgment wasn't properly granted. Yes. All right. Now, then you suggest, though, that the notice is governed by Illinois law, but this late notice provision, or the, I'm sorry, the bad faith is a Virginia statute, isn't it? Right. I mean, if you look at the factors. But why does that apply if it's all tied into the notice question? That is, after, let's assume, just assume that once the insurance company is notified, they have to tell you within 45 days they're going to rely on late notice? Is that what the Virginia statute provides? That's correct. Okay. That's a waiver statute. Okay. But how is that, why does the Virginia law apply when you agree that as far as notice goes, Illinois law applies? Isn't that a procedural issue? No, it's not a procedural issue. If it were, would you concede that then Illinois law would apply? Yes. All right. And tell us why it's not procedural. Okay. First of all, if you look at the factors that you would look at for choice of law, it points to Virginia. But Virginia law and Illinois law are not different on the reasonable time issue that we've been discussing so far. There is a difference in the waiver statute, because we don't have a waiver statute like that in Illinois. And there is a difference in the standard for bad faith in Virginia. But you can waive late notice under Illinois law. Absolutely. And we've argued that. Just because they have a statute. We've argued that. It's just that they've got a 45-day limit in Virginia. But they're all really the same, because they have a 45-day limit. They have a 45-day limit, and it's absolute. You're gone if you don't do it in 40. And they didn't. So, I mean, we've argued under Illinois law in the alternative that there's waiver here, too, because they don't even tell us about their late notice defense until they finally answer this lawsuit a year after they've been given notice. Would that be at least an arguable question of fact, if we got to that point about the waiver? There's no facts that are in dispute. I mean, all that happened. The critical thing, if you look at the claim log of Craig Carver and his deposition, all of which is in the record, he gets notice. First thing he does is he calls up the plaintiff and gets us in all kinds of trouble there. And then he starts, he says, I'm denying coverage based on the exclusion. And he starts writing a letter. That's all he does in July and August. And then he puts it aside. And the only claim log thing is October 6th, after the case has gone and settled, he's been begged by several letters to come help, get involved. He completely ignores those. And then he said, the October 6th thing just says that, I don't think anything much is happening in this case, we better get on with denying. And so he finally sends his denial letter October 6th, I believe, to, you know, outside counsel for approval. The ship's already sailed. There's no effort at all. There's nothing in the record showing that they wanted to evaluate this case, that they wanted to respond to the request for settlement. I've been doing this for 25 years. When there's a late notice with an excess carrier or even a primary carrier, first thing they do is they say, hold the horses, give us some information, give us time to evaluate this, if they're interested in doing that. And Yorkville Bank actually points to that in the prejudice factor when it discusses it. Yorkville is so different, factually, when you have oral notifications multiple times to the insurer about the Kuzma lawsuit and this attempt by the insurance company to suggest there was no coverage. I mean, there really are some significant issues in this Yorkville that just are screaming out through the opinion. I mean, you do agree that they were not trying. They had actual notice more than once. Wasn't there a suggestion that the insurance company was trying to dissuade the insured about the policy coverage? In Yorkville, there was an agent who was notified. Nobody who actually, and he never notified anybody who was doing anything at the insurance company. An agent. An agent. Key word. Right. Right. I mean, and they're tarred with that. Fine. And there was actual notice. But on the ground, there was nobody at the insurance at West American in the Yorkville Bank case who was doing anything until they got written notice. And the court thought it was important that when they did get written notice, they did nothing. The court says that. But here we only have a roughly, was it a five-week period? They had two weeks to, they had two months to trial in Yorkville, and the court says there was no evidence. Was there a notification in this case, was there a notification in this case of the agreement for the three and a half million dollar settlement? Yes. When? That was August 7th. The August 7th letter, after several other letters saying help us, give us your opinion, says we're eager to resolve this case, and they make a proposal. They say can't metal pay 750, we'll pay 150, and there's 275 that Zerk should pay, but we'll take 2 million instead of 2.75 and just get it done. And the end of this letter, this is August 7th, she says, times of the essence, MHM demands Zerk provide a response to both the tender of this letter of compromise, the tender, and this letter of compromise in the next 20 days or no later than August 27th. And they do nothing. And it says at that time MHM's offer to compromise will expire and it will take all steps necessary to protect itself from exposure of the underlying case. They were facing, they'd already been found to have, they were, there was a sanctions motion and the trial court had ruled against them and was contemplating the penalty. And the sanctions motion was brought about because Craig Carver called up the plaintiff and while we were still in this process of figuring out when to give notice, and even though behind the scenes at the exact same time, Dena Johnson sending the excess policy to Eric Singer and saying timely update our discovery request, like five weeks after they first responded, the plaintiff gets this news that there's an excess policy and that's the basis of the sanctions motion and the court's really mad at us. Yeah, but they weren't going to default. It would just be an issue about what sanction was going to be imposed. And at that point you're entitled to a review of that. You're entitled to an explanation being granted. And if the judge jumped the gun a little bit on that, there's a way to deal with that. That's the tail of the dog. For MHM, they had an angry judge who's going to preside over their trial. They'd already turned down two very strong defenses. They were looking at, you know, at that point, an unpleasant trial. And that's why, you know, not surprisingly, their defense counsel had said in April of 2008 this could be a big case and then you add the sanctions motion to that and they're like, let's get rid of this. And there have been settlement discussions all along. Anything else, Mr. Vishnevsky? Just a one minute wrap up? Sure. I think the trial court made a mistake in focusing too much on the facts of Yorkville Bank. There are other cases that are not challenged, like the Walsh case on the first factor that favors MHM because this is an excess policy. The Check Your Taxi case is really very on point. And the fact that you have important defenses matters in evaluating when you're going to look at that policy and give notice. Once we got to that point in April of 2008, there was strong, strong efforts looking at the policy, and yes, they were wrong in thinking it was excluded. How many months later? From April 24th to July 9th, I guess it's May, June, it's a little over two months. But the process during that two months is having counsel say, don't even produce this for discovery, taking that awful chance because he's so convinced there's no coverage. Their primary care is saying there's no coverage. But they didn't stop there. Then they sent it to Dena, who wasn't yet their outside, wasn't yet their general counsel. You are going to have time to rebuttal. But that's the third factor. We concede on the sophistication factor. Right. That's the only one you concede. Right. And on prejudice. No prejudice. Assurance. Thank you. May I proceed? Please. I'm just going to offer some summary points, and obviously your honors will have questions. As far as the West American versus Yorkville case, which is featured prominently in MHM's brief, I don't believe it provides any basis to disturb the trial court's holding. But does it tell us that the first factor is neutral? It does say that. So what do we do with that? Is it neutral here? Or is there some other explanation or some way to distinguish? Or does it say something else that we should consider? It said, what it said, Judge, was the first factor, which is the language of our provision, which requires immediate notice, was neutral in that it's going to be interpreted not to require notice within a particular time frame, but within a reasonable time. All right. So that every case should still be looked at under a time frame that is reasonable. Yes, Judge. Although, and that brings up a second point. I think what MHM is proposing here, and they did it in the trial court, and they're doing it here, is a universal standard for excess policies that doesn't give due weight to the language of the particular notice provision in that excess policy. I think, in effect, what they're proposing is, no matter what an excess policy says, it can have the primary label controls as their argument. Correct. And I think that, I don't think Walsh does that, and I'll talk about that in a second. But I think if that were the case, then all the cases we both cite where we're talking about excess policies and what the notice provisions say and how that language is to be applied, all those cases are irrelevant if there is kind of a one-size-fits-all notice standard on an excess policy. So I think, for what it's worth, under Yorkville, we have the most restrictive notice requirement. The least discretionary notice requirement you can have in an excess policy is in this policy, this assurance policy. I would refer the court to the analysis of the same question in the Northbrook Property and Casualty Company versus Applied Systems case, because there, again, you had a primary policy and an excess policy, both of which had the same language. And the court there applied both notice provisions identically. It did not say, well, because one's an excess policy, there's a whole different reasonableness analysis. So I think that's a flaw in their argument. I don't, I think what they're essentially saying is you've got a one-size-fits-all approach and there are no cases that suggest that. Now, I'm sorry. Well, we've picked on them on issues, to be sure. Sure. Why no response to the letter of April 7th, excuse me, August 7th? Well, let me, and to get to that, I mean, they really, they're saying this, there's this settlement in principle. Let us know what you're going to be doing. We're dealing with this sanctions. We've got this case that's going to have to be decided quickly. Tell us what your position is. Well, I think the timeline here, Judge, has to be taken into account in the fact that, you know, again, they want the court to focus on the five-week period after they gave notice, as opposed to the 25-month period before they gave notice. Okay, but I'm not asking you about that. I know. I've asked them about that. Now I'm asking you why your client didn't respond. Well, on July, here's the timeline, Judge. July 9th, they first tell us about the case. On July 21st, they increased their outstanding settlement offer at that point from $250,000 to $1 million. They don't tell us. Okay, what happened in the interim? On July 15th, we asked for defense counsel's current evaluation and a discovery summary and some motion papers and some pleadings. What happened on July 16th was their defense counsel gave us the motion papers and told us that the in-house counsel or the general counsel, which was Deanna Johnson, would give us the rest of the materials we were asking for. They said to contact her for that, right? It's, the quote is, I'm sorry, I don't have it. Well, let's move on because. The quote, I'm sorry, Judge, was Ms. Johnson will provide you with the other materials you've asked for. And the reason I'm drawing on that is because in his deposition, Mr. Carver said several times, they had just presented me with a case. I asked for what I always ask for, which is what's been going on in discovery? What's the evaluation? They told me I would get that. I had no reason to think I would not. So when two weeks later, there is a letter saying, what's your position? What's your position? We're about to settle this case. He doesn't know. Wouldn't a reasonable response, since we're talking about reasonable behavior, wouldn't a reasonable response be, you want an answer. We haven't gotten anything. Hold everything until we get the answer and then you'll get an answer from us. Well, that certainly would have been an appropriate response. And what's the defense for just putting everything on a no response? Well. Hoping that they step in something and then you have an additional reason to deny the claim? Or is there some other reason? The reason is, Judge, that the carrier and Mr. Carver testified this. He was in no position to recommend, coverage questions aside, that assurance participate at a $2 million level. He still didn't have the evaluation. Was he in a position to say we don't have enough information? He did in his deposition testify. I didn't have enough information. Well, deposition is after the cow has left the barn. The question is, did he tell the people who he was dealing with, who were asking for what you're implying and your client's position is was an unreasonable request under the circumstances. Was there any reason not to say, wait a minute, that's unreasonable to ask us to do this in this time frame. We're going to be diligent, but we need these and we can't give you an answer right now. And what is the explanation? What is the justification for remaining mute, as it were? The explanation is that he didn't have sufficient information to tell them yes or no on coverage. Did he have sufficient information to say we don't have sufficient information? He already had. He already had when he asked them for what he asked them for. And there is this strain running through their briefs and through the deposition testimony. You can look at it as, why didn't you ask again? Why didn't you ask again? Why didn't you ask again? I appreciate what you're saying, Judge. If I had been right next to Mr. Carver and writing appropriate responses to set up this litigation in the way that opposing counsel was with MHM, and that's in the record, that they were already consulting with their counsel at the time of these communications. Yeah, there probably would have been a different response. But why is Mr. Carver unreasonable after he asked for completely innocuous information he's entitled to? What is the case about? And he's told, we'll get that stuff to you. Why is he required to say, give it to me, give it to me, give it to me? Why is it not incumbent upon them to give it to him? And by the way, they didn't tell him, they did not respond to him. They said, we'll give it to you. And they never told him they weren't intending to give it to him. And if you look at the emails in the record, they're telling him one thing and doing something else, and I appreciate what you're saying. But look at what we're talking about here, Judge. But here's the situation where there is actual notification that there is a settlement offer on the table that they're seriously considering. And your company knows that at least from their point of view, your insured's point of view, they believe that you have coverage. And they're saying, time is of the essence. We have to have an answer on this. And if there is a good response available as to why you, your client, could not answer the question posed in that letter regarding the settlement, you see, the question is, why didn't you, using the word, notify them of your inability to give them that answer within the time frame? And as anybody can see, there were things that if people were acting, we'll use the word that Mr. Vishnetsky used prudently, that both sides could have and should have done differently in this case. What this case turns upon are the five factors in Yorkville. And what leads me to say I'd like to know what real prejudice there was to your client when it was told of the potential settlement, told that it was time of the essence, and they chose not to respond to the letter in any express way. Well, the question, I'm sorry, the first, I'm going to, and if it's reiterating, I apologize. As far as why he didn't, you know, what is the explanation for not firing off a letter on August 6th saying, hey, I still don't have that stuff? The explanation is you already asked him for that stuff. You already told him it was impossible for him to evaluate without that stuff. I'm less concerned about a second request for information, which has been requested the first time, than I am about the total absence of a response to we have this time of the essence settlement offer out there and we need to know what your position is. And your letter back, if there one had been written, could have said, we are still awaiting something, so we cannot answer your letter as to the permission, as to our position, because we don't have sufficient information yet. That's all true, Judge, but if you look at the timeline, I mean, the fact that we're even in this position demonstrates that we're prejudiced by what's happened before. We've got an initial. Well, if your response had been, I'm sorry, you have not given us enough information so we can't take a position now, and they acted without you, without giving you that information, then your position of prejudice would have been a little different, because you would have said, wait, we'll evaluate it, but we're not able to evaluate it now. And if they decide at that point to go forward in response to that, then that puts you in a slightly different and slightly better position than if you say and do nothing. Wouldn't you agree? Better position for purposes of this litigation, certainly, Judge. Well, was the attorney, Johnson, asked at deposition or at any time whether she ever provided the information to assurance that was requested? Yes, and she said no. And what did she say? She said no. Did she have any explanation for why? I'm going to, let me answer that question first with her own words in the email when the defense counsel says to Ms. Johnson, should I give him these things he's looking for, meaning the evaluation and discoveries summary. She responds to her defense counsel, absolutely not. I gave him permission to speak with you. Unless he's putting his $2 million on the table right now, he has no say in anything. That's what she told her defense counsel on July 15, 2008, while her defense counsel said, you'll get the stuff you're looking for from Ms. Johnson. What she said in her deposition, Judge, when I asked her, why didn't you give Mr. Carter the evaluation he asked for, she said, well, I wasn't sure if he was asking for the evaluation that was done on April 20, whatever it was, about five or six weeks before this, which forecasted an 85% chance of liability and a verdict of somewhere between $10 and $100 million.  I thought when he said, when he was asking for an evaluation, he wanted Mr. Singer to do a new one, and I didn't want Mr. Singer to do a new one. And then I asked her, well, did you tell Mr. Carver we've got this April 20 something evaluation, do you want this one or do you want a new one? And she said, I never had that conversation with Mr. Singer, I mean, I'm sorry, with Mr. Carver. The point of fact, Judge, and I don't mean to be sarcastic in tone, is they weren't going to give him the information he asked for. What she said is exactly what she meant. Unless he's putting his $2 million on the table right now, he has no say in anything. In other words, you've got to commit to paying and funding the settlement before we're going to tell you what the case is about, and that is unreasonable. That's why we were prejudiced, Judge. You ask why we were prejudiced in that situation? Because we didn't know until August 4 that the settlement negotiations were going on. Okay? And, I'm sorry, August 6, August 6, and then on August 7, they tell us it's a tentative $3.5 million settlement, and then by August 15, it's done. Okay? So, and that really brings up the prejudice argument that I need to sort of draw out a little bit, because for the, it's a schizophrenic case they present to you. They argue strenuously that this was a defensible case. It was a defensible case. Camp Med had it evaluated at a sum of value of $700,000. We thought we were going to win. We had arguments that we should have won as a matter of law. Okay. For all that to be, if any of that was true, then we had an opportunity to evaluate those arguments, we being an assurance company, and determine whether 3.5 was a reasonable number. If assurance, I'm sorry, if Camp Med was right about its evaluation, which is what they fervently want you to believe for the first 25 months of the case until notice is given, if Camp Med was right, then this settlement was unreasonable. Now, did we have a basis to challenge it, Judge, to go to your question? No. We didn't have the evaluation. We didn't have the months and months of analysis, and this is in the record, that the MHM folks had undertaken with Mr. Singer, with Lee Calagaro, with Ms. Johnson. I'm not quarreling with that. I'm quarreling with the lack of response. Well, then it comes down to, Judge, are we going to saddle assurance with this, paying for the settlement in this case that they didn't know about, because Mr. Carver didn't say for the second time, I need an evaluation to, before I can tell you whether we're going to pay $2.5 million, which is practically. Mr. Calagaro, you keep changing it to a second request for information when my question, I think, is abundantly clear that it has, I'm not questioning that. You ask once, they didn't give it to you. I'm talking about a response saying, you didn't give it to us, so we can't answer your question, and maybe you want to hold off until we give us the information so that we can do exactly the type of analysis that you've just detailed quite reasonably would have to be done before you commit to a $3.5 million settlement. Well, would it ever be reasonable for a commercially sophisticated insurer, such as MHM, that has the services of inside counsel and outside counsel, to believe that a company would be able to commit to a $3.5 million settlement without knowing the defense counsel's evaluation? I mean, of course not. And. If you were sitting there, you would have said, tell him that, wouldn't you? Judge, I'm a coverage lawyer, and I would have positioned the case as strongly as I could to avoid, but see, that really isn't the point. Why is, where is the point? I mean, you know, we went through this in the depths, and I said this to Judge Mason, but, well, you know, we do a lot of beating up on Mr. Carver here, and he did not know. He maybe should have, but he did not conduct himself as if he was being set up or maneuvered into failing to issue the right response at the right time. Okay, that's all he, what he did do was reasonable. Give me the evaluation, and I'll tell you if we can, if it's covered, and I'll tell you what we think of the case. They never did that, and then the daily issue of letters starts, and you tell them about film negotiations exist on August 4th, and the case is tentatively set, I'm sorry, August 6th, the case is tentatively settled August 7th, the case is irrevocably settled August 15th. This was. You mean September. I'm sorry. September 15th? No, I mean August 15th, because August 15th is the date Deanna Johnson wrote to the plaintiff's counsel and said, I hereby accept the. And then it's not papered until September.  That's all it is. Okay. I'm sorry, do I have time briefly? Briefly. Okay, I just wanted to say one thing about Walsh, Judge, which is just that in that case, this is going back to the case, which again, just showed up in their reply brief. I never saw it before, you know, below or in their brief and sheet. So I want to say one thing about Walsh, again, it doesn't, I don't think it sets up a one-size-fits-all analysis. It says the language in the notice provision contemplates the exercise of some judgment on the part of the insured, and that judgment is necessarily impacted by the particular facts of each case. That is 352 ill at 3rd, 5th at, I think at 510. The point to make here is Walsh dealt with a situation where the insured had $100 million of coverage in a construction wrap-up policy. And that disappeared overnight because of the liquidation of the carrier. And against that factual background, the court said the case is reasonable, and the court just said each case, the facts of each case are going to determine reasonableness. The facts of those cases is not remotely like what we have here. Here we had MHM evaluating, controlling, and defending the case for 25 months before they gave notice. And the facts are undisputed. They did not consider the question of whether or not our policy applied until late April 2008, and Judge Mason, so the idea of the defensibility of the case is something of a smokescreen. The defensibility of the case is not why notice was delayed. Notice was delayed because they never went to the drawer and pulled out the policy and figured if it might apply. And Judge Mason said that point blank, and she said, I've never seen a case where the insurer simply doesn't look at the policy for almost two years and then is found to have acted diligently. That's the thing. The two factors, Judge, to your point are diligence, there was none. They didn't look for the policy until a discovery request came in from AB's counsel for all policies. That's the first time they thought about the issue. And by that time, they'd already lost their motion for summary judgment. In prejudice, Judge, we didn't know what the case was worth. We couldn't have given them a cogent answer when they asked for it. Thank you, Mr. O'Gallagher. Any final words, Mr. Vishneski? Mr. Justice Pice, the Walsh case and Mr. Carper's conduct. Yeah, that's the one case in your brief where you happened to mention that it's authored by someone? It was authored by Justice Pice, who's now on the Supreme Court. Why is this case different than any others that you chose to put an author in there? Because it's a justice who's now on the Supreme Court. Okay. A superstar of this court. And it's a recent case. Pay particular attention to that one. Well, I do want you to pay particular attention, because I'm going to go way on a limb here. This case is recent. It's authored by a prominent judge. And it is on all fours on the first factor. The language in the Zurich policy, not surprisingly, for notice, is identical to the language in the Zurich assurance policy for notice. And the court says, and Zurich makes exactly the argument that my opponent makes to this court, says that the policy should not be treated like other true access policies, which give the insured discretion, because it had that language. And the court says, it's two things. It's the nature of the policies and excess policy goes into what is a reasonable time in this context. Simply applying that principle, that reasonable time, it matters that you have an excess policy. But also, the court points to the valid and collectible, exhaustion and valid and collectible other insurance provision, reading the policy as a whole. We've done that from day one in this case. Because this case, for example, in our policy, there is a defense provision that says, we have no duty to defend, don't bother us. But, if this case is reasonably likely to come within our limit, then we have the right and opportunity to participate. Okay, so they've already, you know, reading it as a whole. And you also, of course, have the same exhaustion requirements in the policy in this case. So, the Walsh case could not be any more on all fours. And it doesn't make the first factor neutral. It puts it in favor of MHM. Because it's good. But does that tie into the prejudice aspect of this whole thing? Is that the policy provides that they do have the right to participate? If the case is reasonably likely to come in. And yes, if they had bothered to do anything. And let me address that. You know, Zurich's assurances own internal guidelines to people like Craig Carver. Where, if you know about a defense, you're supposed to tell the insurer within 30 days. And he and his supervisor all agreed that, yeah, that's our policy. Didn't do it, sorry. It's not really required. It's just our policy. Right? So, it's not crazy for Dena Johnson on July 9th to say, things are moving fast. We need your coverage opinion. We need to know whether you're with us or you're going to be against us on this. And what Mr. Carver was asking for, he did get the summary judgment brief. He did get all the pleadings. What he didn't get was the internal stuff, the April 24 letter. You have 25 months of litigation and they're trying to get up to speed. And your general counsel says, basically, pile of sand unless you put $2 million on the table. There's actually a point to that. The point is. That you don't get the information unless you come up with the money. No. Unless you give us your coverage position. They don't necessarily have to evaluate it and say, we're going to give you this money. But they have to tell us whether they're going to deny on an exclusion or late notice or not. Which has nothing to do with the evaluation stuff. Because there's a waiver of privilege issue. When there's a decision to come up with the amount of $3.5 million, isn't that what it eventually settled for? Yes. When did it come to be that it was going to be $3.5? Was assurance in? Yes. Assurance was in the game at that point. And did it go from $1.5? It was never $1.5. Well, what did it go from? There was a settlement conference on June 17th. And there had been a $7 million demand by the plaintiff on June 15th, 2008. The settlement conference ended at 230. And all that money was. So there was a demand for $7 million. Right. What month? In June.  And you're saying. Fifteen days or so before. It would be reasonable at that, not at that point, to do anything. At that point, it's in process. Nina Johnson's just getting on board. But $7 million is demand. $7 million is demand. And the excess company was not even given a look at that point. Julie. At that point, everybody had agreed that there was no coverage under the policy. So that would be a yes. They had the $7 million total. Yeah. And what was it before the second million? What was the demand before the second million? No demand. No demand. No demand up to that point. Okay. And Camp Med only authorized $300,000 based on its evaluation of the case at that point. For the settlement thing. And when was it decided to give them more than whatever? We would give them anything they wanted if they would be involved in the process. No, I mean, how did you come up with the first amount that you were willing to tender? That was the same deliberative process that's been going. What was the response to the $7 million? It was ultimately at that settlement conference, $230,000. And then did it increase at all before Assurance got involved? No. So it was a $7 million demand, $230,000 tender. Well, they came down to $6 million in the settlement conference. What time? When did they come to $6? June 17th in the settlement conference. Okay. And all right. Well, we know in June that there was a demand $7 and then $6. Right. All right. Last point I want to make is, whatever Mr. Carver had in mind, on October 6th he had no idea the case had settled. And he sent his recommendation to outside counsel that the coverage be denied. There's no indication that he had any evaluation of the case or in any way looked at whether or not Assurance would do anything. It's like he had no information. He just didn't do anything except write a denial of coverage letter. Never asked a question. Oh, one last question. Was the $7 million demand after the, it was after the summary judgment was lost? Yes. Yes. Summary judgment was March 11, 2008. Then in April everybody starts looking at the policy. And there's the diligence. They start looking at it? Yeah. They're looking at it hard. And they're wrong-footed. They're wrong-footed. And they get right-footed, it's still a line item. All right. Thank you both very much. Very well-prepared briefs and oral argument. Take the matter under advisement. And we'll issue a ruling in due course. And we are adjourned.